VASUDHA TALLA (State Bar No. 316219)
vtalla@aclunc.org
WILLIAM S. FREEMAN (State Bar No. 82002)
wfreeman@aclunc.org
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION OF NORTHERN CALIFORNIA
39 Drumm Street
San Francisco, California 94111
Telephone:        (415) 621-2493
Facsimile:        (415) 255-8437

*Attorneys for Plaintiff*
*Additional Counsel Listed on Following Page*

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| GABRIELA SOLANO, on behalf of herself and those similarly situated, <br> *Plaintiff,* <br><br> vs. <br><br> U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT; TAE D. JOHNSON, Acting Director of U.S. Immigration and Customs Enforcement; DAVID MARIN, Director of Los Angeles Field Office, U.S. Immigration and Customs Enforcement; DAVID JENNINGS, Director of San Francisco Field Office, U.S. Immigration and Customs Enforcement, <br><br> *Defendants.* | Case No. 2:21-cv-01576 <br><br> **CLASS ACTION COMPLAINT** |

ADDITIONAL COUNSEL

JINGNI (JENNY) ZHAO (State Bar No. 284684)
jennyz@advancingjustice-alc.org
GLENN KATON (State Bar No. 281841)
glennk@advancingjustice-alc.org
ANGELA F. CHAN (State Bar No. 250138)
angelac@advancingjustice-alc.org
ANOOP PRASAD (State Bar No. 250681)
anoopp@advancingjustice-alc.org
MONICA RAMSY (State Bar No. 329941)
monicar@advancingjustice-alc.org
ASIAN AMERICANS ADVANCING JUSTICE–
ASIAN LAW CAUCUS
55 Columbus Avenue
San Francisco, California 94111
Telephone: (415) 896-1701
Facsimile: (415) 896-1702

JACOB S. KREILKAMP (State Bar No. 248210)
jacob.kreilkamp@mto.com
DAVID W. MORESHEAD (State Bar No. 305362)
david.moreshead@mto.com
MUNGER, TOLLES & OLSON LLP
350 South Grand Avenue
Fiftieth Floor
Los Angeles, California 90071-3426
Telephone:   (213) 683-9100
Facsimile:   (213) 687-3702

Case No.

1

# **INTRODUCTION**

2       1.    On August 31, 2020, Tien Pham was moments away from seeing his

3   family after 20 years of separation. A refugee born in the aftermath of the Vietnam

4   War, Mr. Pham came to the United States as a child and settled with his parents and

5   sisters in the Bay Area. When Mr. Pham was 17 years old, he got into a fight with a

6   group of teenagers, stabbing one of them. He was charged as an adult and convicted

7   of attempted murder. While incarcerated, Mr. Pham obtained his college degree,

8   became a leader in an ethnic studies program and an accomplished distance runner,

9   and worked with the San Quentin News. The Board of Parole Hearings

10  recommended that Mr. Pham be released from prison early, noting that his

11  involvement in the crime was due in large part to his young age and that he no

12  longer posed a danger. While his family and friends waited in the parking lot of San

13  Quentin for Mr. Pham to walk out the doors and embrace them, a private contractor

14  sent by U.S. Immigration and Customs Enforcement ("ICE") entered the building.

15  Even though he lacked lawful authority to do so, the private contractor shackled and

16  arrested Mr. Pham. He was driven to an ICE office and then flown to a detention

17  facility in Colorado.

18      2.    Hundreds of people like Mr. Pham are arrested each year and

19  transferred from state or local custody into ICE custody. Many are arrested not by

20  ICE officers or employees, but rather by third-party private contractors who have no

21  lawful authority to make immigration arrests.

22      3.    Since at least 2016, Defendants have routinely and systemically

23  directed and retained employees of G4S Secure Solutions, Inc. ("G4S") to arrest

24  individuals at jails and prisons in California for immigration enforcement purposes

25  without any ICE immigration officer present (the "Private Contractor Arrest

26

27

28

Policy").[1] After arresting people by placing restraints and shackles on their wrists, legs, and body, the private contractors transport them to ICE offices where they encounter an ICE officer for the first time after their arrest.

4.     Defendants' use of private contractors to perform immigration arrests violates federal law. The Immigration and Nationality Act and its implementing regulations authorize only "immigration officers" who are federal employees and have received a specific form of training to arrest individuals for violating immigration law. *See generally* 8 U.S.C. § 1357(a); 8 C.F.R. § 287.5. G4S Secure Solutions and its employees are not immigration officers or employees of the federal government; nor do they receive the training immigration officers are required to take in order to make civil immigration arrests.

5.     Defendants' Private Contractor Arrest Policy is an ongoing violation of federal law, and results in numerous illegal arrests that wrongfully deprive individuals of their liberty.

6.     Defendants continue to retain and direct private contractors to arrest individuals despite longstanding public criticisms, complaints, and lawsuits regarding the contractors' lack of training and neglect of people in their care.

7.     Unless the Court intervenes to declare this practice unlawful and bring it to a halt, many individuals will continue to be unlawfully arrested.

8.     Plaintiff Gabriela Solano therefore brings this action on behalf of herself and a class of similarly situated persons. Ms. Solano has lived in the United States since she was two years old and was recently found suitable for release from state prison on parole. ICE has notified Ms. Solano that it intends to detain her for removal proceedings upon her release from state custody. Thus, Ms. Solano faces an imminent threat of being arrested by a private contractor in the same unlawful

---

[1] Although participation in the arrest by a person who does not meet the requirements of the law is prohibited even if an ICE officer were present, ICE's current policy and practice is to use G4S without an ICE officer present.

manner that Mr. Pham and so many others have experienced. Ms. Solano and the class she seeks to represent request a judicial declaration that Defendants' Private Contractor Arrest Policy violates federal law, and a permanent injunction prohibiting Defendants from continuing to enforce the policy.

## JURISDICTION AND VENUE

9.      Jurisdiction is proper pursuant to 28 U.S.C. § 1331, as the claims alleged in this Complaint arise under federal law, including the Administrative Procedure Act, the Immigration and Nationality Act, and federal regulations.

10.     Defendants have waived sovereign immunity for purposes of this suit. 5 U.S.C. § 706.

11.     The Court has authority to issue a declaratory judgment under the Declaratory Judgment Act, 28 U.S.C. §§ 2201-02, and Rule 57 of the Federal Rules of Civil Procedure. A substantial, actual, and continuing controversy exists between the parties.

12.     Venue is proper under 28 U.S.C. § 1391(e) because the Defendants are federal agencies and officials and the Plaintiff resides in this district.

## PARTIES

13.     **Plaintiff Gabriela Solano** is a 48-year-old woman currently in the custody of the California Department of Corrections and Rehabilitation ("CDCR"). She is currently housed in the Central California Women's Facility in Chowchilla, California. Ms. Solano is a lawful permanent resident of the United States. Prior to her incarceration, Ms. Solano's domicile and residence was in Montebello, California. She is subject to an ICE immigration detainer request that asks CDCR to notify ICE of her release date and transfer her to ICE custody upon release. Her release from CDCR custody is imminent.

14.     **Defendant U.S. Immigration and Customs Enforcement** is a federal law enforcement agency within the Department of Homeland Security ("DHS"). ICE is responsible for the criminal and civil enforcement of immigration laws,

including the detention and removal of immigrants. ICE enters into contracts with entities for the provision of services in support of its enforcement and detention operations. Enforcement and Removal Operations, a division of ICE, manages and oversees the immigration enforcement and detention systems. Enforcement and Removal Operations issues immigration detainers and immigration warrants and oversees the arrests of individuals from state and local law enforcement agencies.

15.    **Defendant Tae D. Johnson** is the Acting Director of U.S. Immigration and Customs Enforcement. In this capacity, Defendant Johnson is responsible for the administration and enforcement of federal immigration laws. Defendant Johnson has direct authority over ICE's policies, practices, and procedures relating to the arrest and detention of individuals, and is responsible for ensuring that they comply with all relevant law. Defendant Johnson is sued in his official capacity.

16.    **Defendant David Marin** is the Director of the Los Angeles Field Office of U.S. Immigration and Customs Enforcement and maintains his office in Los Angeles, California, within this judicial district. Defendant Marin and the Los Angeles Field Office are responsible for carrying out ICE's immigration enforcement and detention operations in the Los Angeles Field Office Area of Responsibility, which includes the Los Angeles Metropolitan Area (Counties of Los Angeles, Orange, Riverside and San Bernardino) and the Central Coast (Counties of Ventura, Santa Barbara and San Luis Obispo). Defendant Marin carries out and oversees the implementation of the ICE Private Contractor Arrest Policy within the Los Angeles Field Office Area of Responsibility. Defendant Marin has direct authority over ICE's policies, practices, and procedures relating to the arrest and detention of individuals, and is responsible for ensuring that they comply with all relevant law. He is sued in his official capacity.

17.    **Defendant David Jennings** is the Director of the San Francisco Field Office of U.S. Immigration and Customs Enforcement and maintains his office in San Francisco, California. Defendant Jennings and the San Francisco Field Office

are responsible for carrying out ICE's immigration enforcement and detention operations in the San Francisco Field Office Area of Responsibility, which includes Northern California from the California-Oregon border down to and including Kern County, California. Defendant Jennings carries out and oversees the implementation of the ICE Private Contractor Arrest Policy within the San Francisco Field Office Area of Responsibility. Defendant Jennings has direct authority over ICE's policies, practices, and procedures relating to the arrest and detention of individuals and is responsible for ensuring that they comply with all relevant law. Defendant Jennings is sued in his official capacity.

## FACTUAL ALLEGATIONS

**I.**    **Federal Law Contains Clear Limitations on Immigration Arrest Authority**

18.    The Immigration and Nationality Act ("INA") and its implementing regulations set forth the authority of federal agencies to arrest individuals for alleged violations of the INA.

19.    Congress has provided that ICE may arrest an individual for civil immigration violations pursuant to an administrative warrant of arrest. *See* 8 U.S.C. §§ 1226(a) (authorizing arrest and detention of noncitizen, based on administrative warrant, pending decision on whether noncitizen is to be removed), 1357(a) (authorizing ICE officers to "execute and serve" warrants, subject to regulations). Alternatively, ICE may arrest an individual without a warrant if an ICE officer has reason to believe that the individual is present in violation of immigration law and is likely to escape before a warrant can be obtained. *See* 8 U.S.C. § 1357(a)(2).

20.    The INA provides that only "*officer[s] or employee[s] of the Service* authorized under regulations prescribed by the Attorney General shall have power without warrant . . . to arrest any [noncitizen]" for violations of immigration law.

*See* 8 U.S.C. § 1357(a), (a)(2) (emphasis added).[2] The INA also provides that "[u]nder regulations prescribed by the Attorney General, *an officer or employee of the Service*" may "execute and serve" an arrest warrant. *Id.* § 1357(a) (emphasis added).

21.     The INA defines "immigration officer" as "*any employee or class of employees of the Service or of the United States* designated by the Attorney General, individually or by regulation, to perform the functions of an immigration officer specified by this chapter or by any section of this title." 8 U.S.C. § 1101(a)(18) (emphasis added). Neither G4S nor its personnel are employees of the Department of Homeland Security (formerly "the Service") or the United States.

22.     The INA's implementing regulations also impose limitations on the authority to make arrests for civil immigration violations. Only specified categories of "immigration officers [as defined in the INA] who have successfully completed basic immigration law enforcement training are [] authorized and designated to exercise the arrest power conferred by [8 U.S.C. § 1357(a)(2)]." 8 C.F.R. § 287.5(c)(1); *see also* 8 C.F.R. §§ 287.8(b)(3), (c)(1). Likewise, only specified categories of "immigration officers who have successfully completed basic immigration law enforcement training are [] authorized and designated to exercise the power pursuant to [8 U.S.C. § 1357(a)] to execute warrants of arrest for administrative immigration violations issued under [8 U.S.C. § 1226]." 8 C.F.R. § 287.5(e)(3); 8 C.F.R. § 287.8(c)(1); 8 C.F.R. § 236.1(b)(1); *see also* 8 C.F.R. § 1.2 (defining "[i]mmigration officer[s]" as specified officers or employees "of the Department of Homeland Security or of the United States").

---

[2] In 2003, the functions of "the Service," *i.e.*, the former Immigration and Naturalization Service, were transferred to the newly formed Department of Homeland Security. *See, e.g.*, *United States v. Ramos*, 623 F.3d 672, 675 n.2 (9th Cir. 2010).

23.     "Basic immigration law enforcement training" as used in 8 C.F.R. § 287.5 refers to completion of a specified training course "provided at the Immigration Officer Academy or Border Patrol Academy" or "training substantially equivalent thereto as determined by the Commission of [U.S. Customs and Border Protection] or the Assistant Secretary for ICE with respect to personnel in their respective bureaus." 8 C.F.R. § 287.1(g).

24.     These regulations limit the agency's arrest authority to categories of immigration officers who "have graduated from an accredited course of training in the exercise of that authority" and are likely to need the authority in the course of their duties. *Enhancing the Enforcement Authority of Immigration Officers*, 59 Fed. Reg. 42,406, 42,408 (Aug. 17, 1994).

25.     Private contractors like G4S and its employees, including those who arrest individuals at jails and prisons, are not federal employees and therefore cannot constitute "immigration officers" within the meaning of the INA.

26.     G4S and its employees, including those who arrest individuals at jails and prisons, have not completed "basic immigration law enforcement training."

27.     Private contractors like G4S and its employees, including those who arrest individuals at jails and prisons, are not authorized under the INA to make either warrantless arrests or to make arrests based on administrative immigrant warrants.

## II.     ICE's Policy of Retaining and Directing G4S To Arrest Individuals

28.     Since at least 2016, Defendants have routinely and systemically directed and retained employees of G4S to arrest individuals at jails and prisons in California for immigration enforcement purposes. Defendants have sought the transfer of those individuals from state and local custody using third-party contractors like G4S, without any ICE immigration officer present. Defendants' Private Contractor Arrest policy is reflected in a contract between ICE and G4S (the

1  "Contract"); a variety of documents and forms; and the systematic, routine, and

2  pervasive practice of G4S conducting immigration arrests across many years.[3]

3      29.   Defendant ICE has contracted with G4S from at least 2012 through the

4  present to provide detention officer and transportation services in the Areas of

5  Responsibility of its San Francisco Field Office, its Los Angeles Field Office, and

6  its Phoenix Field Office. Since at least 2016, G4S's work under the Contract has

7  included making immigration arrests, without an ICE officer present, of individuals

8  in CDCR and county custody.

9      30.   The individual Defendants are aware of the Contract and associated

10  Contract-related documents, and possess responsibility for directing the services of

11  G4S personnel pursuant to the Contract.

12      31.   Under the Blanket Purchase Agreement ("Purchase Agreement") in

13  effect between 2012 and 2017, ICE contracted with G4S to provide detention and

14  transportation services in the Areas of Responsibility of its San Francisco Field

15  Office, its Los Angeles Field Office, and its Phoenix Field Office. There is currently

16  a Purchase Agreement in effect between February 1, 2018, and July 31, 2023, under

17  which ICE continues to contract with G4S for the same services.

18      32.   The Statement of Work accompanying the Purchase Agreement in

19  effect between 2012 and 2017 reflects the Private Contractor Arrest Policy. The

20  Statement of Work states that G4S was required to provide armed detention services

21  to pick up and transport detained individuals within the Area of Responsibility to

22  and from jails and prisons, among other locations.

23

24  ───────────────────

25  [3] The Contract between ICE and G4S consists of a Blanket Purchase Agreement, the

26  accompanying Statement of Work, schedules, attachments, and appendices, as well
    as the contract orders and extensions that are placed pursuant to the Blanket

27  Purchase Agreement. A Blanket Purchase Agreement is a long-term agreement
    between a federal agency and a contractor to deliver goods or services on a recurring

28  basis over a set period.

33.     Upon information and belief, the current Contract with G4S, including the Statement of Work and Purchase Agreement, are the same as, or materially similar to, the Statement of Work, Purchase Agreement and Contract with G4S from 2012 to 2017.

34.     Pursuant to the Contract, and in order to fulfill Defendants' directions to arrest individuals in jails and prisons, G4S hires and employs purported "detention officers" who are based in ICE field offices in Ventura, Los Angeles, San Bernardino, Santa Ana, Lompoc, San Francisco, San Jose, Bakersfield, Fresno, Stockton, and Sacramento.

35.     As Defendants are aware, detention officers hired and employed by G4S are not employees of ICE. Nor are they federal law enforcement officers. The Statement of Work for the Purchase Agreement explicitly states that G4S "[a]rmed contract detention officers are not federal law enforcement officers. Even though the armed contract detention officers are performing work on behalf of the federal government, they have not been statutorily granted or delegated authority to enforce federal laws."

36.     In 2016, ICE personnel circulated a list of the transportation routes that G4S serviced in support of the ICE San Francisco Field Office. This list was assembled in order to incorporate it into the Contract that is currently in effect between ICE and G4S. According to this list, G4S contracted to transport detained immigrants from the following jails and prisons: Pelican Bay State Prison; San Quentin State Prison; Salinas Valley State Prison; Soledad State Prison; CSP-Susanville; CSP-High Desert; Mule Creek State Prison; CSP-Folsom; CSP-Sacramento; Solano State Prison; California City Correctional Facility; Central Valley State Prison; Delano State Prison; North Kern State Prison; Shafter Community Correctional Facility; Taft Community Correctional Facility; Tehachapi State Prison; and Wasco State Prison. On information and belief, at Defendants' direction, G4S personnel carried out numerous arrests at these prisons without an

ICE officer being present. The individual Defendants were aware of and/or ratified the use of G4S employees to make arrests at these jails and prisons.

37.     The individual Defendants also created and/or ratified the creation and use of a form entitled "G4S Detainee Checklist." The form, on G4S letterhead, makes clear that G4S employees are tasked with arrests of individuals from jails and prisons. The form requires the G4S employee who is "picking up a [noncitizen] at a local jail" to note the "pick up location" of an individual and whether they are being picked up with money, property, and/or medication, and whether any medical or psychological issues have been identified. The form notes for the G4S employee, "If you are picking up a [noncitizen] at a local jail and spot one of these terms on the medical summary, you must stop and contact control room before assuming custody. . . . If you have any doubt about a medical condition, contact control and seek clearance before assuming custody and transporting."

38.     Defendants systematically arrange for the arrest of people at jails and prisons for alleged civil immigration offenses after Defendants have sought the transfer of those individuals from state and local custody. Defendants direct G4S and its employees to carry out these arrests without any ICE officer present.

39.     Defendants generally learn that an individual is in the custody of CDCR or a county sheriff when the individual is fingerprinted and their biometric information is shared with the Federal Bureau of Investigation, which then shares the information with ICE.

40.     After reviewing biometric information, Defendants generally request to interview individuals in CDCR or county custody whom ICE may seek to remove from the United States. Defendants use the information that the individuals provide during these interviews to determine whether they will request the transfer of the individual to their custody.

41.     Defendants formally request the transfer of an individual from CDCR and county custody through DHS I-247A immigration detainer forms. The I-247A

form requests that the law enforcement entity notify ICE of the individual's release date and detain a person in its custody for up to 48 hours beyond the individual's release time to allow ICE to arrest the individual and to take physical custody of them.

42.     On any given day between January 31 to May 13, 2020, between 9,500 and 10,000 individuals in CDCR custody were the subject of an ICE detainer request. ICE issued approximately 2,800 detainers to state facilities in federal fiscal year (FY) 2019; approximately 3,500 detainers to state facilities in FY 2018; approximately 3,200 detainers to state facilities in FY 2017; and approximately 2,500 detainers to state facilities in FY 2016.

43.     ICE issued almost 25,000 detainers to county facilities in California in FY 2019; approximately 25,500 detainers to county facilities in FY 2018; approximately 18,800 detainers to county facilities in FY 2017; and almost 10,000 detainers to county facilities in FY 2016.

44.     Defendants on occasion also send an administrative arrest warrant to CDCR and counties on a DHS I-200 form. The I-200 form largely duplicates the I-247 detainer form in asserting probable cause of an individual's removability from the United States.

45.     Defendants issue these detainers and warrants without any judicial review or judicial determination (either before or promptly after the ICE arrest) of whether there is probable cause of the individual's removability from the United States.

46.     CDCR treats ICE detainers as requests that CDCR notify Defendants of an individual's release date and transfer the individual from CDCR's custody to ICE's custody. County sheriffs also treat a subset of ICE detainers as requests for

notification and transfer of physical custody, in accordance with applicable California state law.[4]

47.    CDCR places an "ICE hold" on an individual in CDCR custody upon receipt of an ICE detainer. This includes recording the ICE detainer and request for notification and transfer within the individual's CDCR Central File and other CDCR records. Counties similarly maintain records on the individuals in their custody for whom they will notify Defendants of their release date and time.

48.    CDCR notifies Defendants of the release dates of individuals with ICE holds. CDCR makes arrangements with Defendants to transfer an individual with an ICE hold to ICE custody up to five business days prior to their scheduled release date from CDCR.

49.    County sheriffs similarly respond to a subset of ICE detainers by providing ICE with notification of an individual's release date and time and arranging for their transfer to ICE custody, in accordance with applicable California state law.

50.    CDCR staff hold individuals subject to an ICE detainer in a secure area within CDCR premises so that they can be arrested by G4S in a transfer to ICE custody.

51.    Defendants direct G4S employees to travel to CDCR facilities and county jails to arrest individuals in CDCR and county custody without an ICE officer present during the arrest. Defendants direct G4S employees to take physical custody of these individuals by placing shackles around their wrists, legs, and

---

[4] The California Values Act (SB 54, codified as Cal. Gov't Code § 7284 (2018)) restricts local law enforcement's discretion to notify ICE of an individual's release date and transfer an individual to ICE custody. *See, e.g.*, *United States v. California*, 921 F.3d 865, 876 (9th Cir. 2019), *cert. denied*, 141 S. Ct. 124 (2020). Some California counties have adopted policies that further limit their cooperation with ICE.

Case No.

bodies. Defendants direct G4S employees to restrain the individuals so that they are not free to leave.

52.     During the arrest of individuals, G4S employees enter CDCR facilities and county jails, unaccompanied by any officer or employee of ICE. The G4S employees place the individual being transferred to ICE custody in shackles and chains—placing cuffs on their wrists and feet, which are often connected to a chain around their waist. The G4S employees then escort the individual out of the CDCR facility or county jail and place them in a vehicle that is operated by the G4S employees.

53.     On information and belief, the individuals carrying out such arrests at prisons and jails in California wear grey uniforms, often with a patch that reads "G4S."

54.     G4S contractors then drive the chained and shackled individuals from CDCR facilities and county jails to an ICE office. At the ICE office, the arrested individual encounters an ICE officer or employee for the first time since the individual's arrest by a G4S employee.

55.     At the ICE office, the ICE officer determines whether the individual will be released on a monitoring mechanism, released on bond if the individual can post bond, or held without bond in an immigration detention facility.

**III.   G4S Lacks Proper Training and Engages in Serious Misconduct, Which Jeopardizes the Safety of Detained Individuals**

56.     Because private contractors are not federal employees, no amount of proper training would make it lawful for Defendants to contract with G4S (or any other private company) to conduct immigration arrests and coercive transfers from state and local detention facilities into ICE custody. Nevertheless, the problematic safety record of G4S compounds the harm to individuals and places their safety at risk.

57.    Defendants continue to contract with G4S, formerly known as the Wackenhut Corporation, even though G4S has been accused on multiple occasions of failing to properly train its employees, creating hazardous conditions for the populations it is charged with protecting, and failing to address acts of misconduct committed by its employees.

58.    In California, G4S regularly subjects detained immigrants to burdensome and lengthy voyages, fully shackled with limited access to food, water, and toilets. In 2019, four women almost died while being driven by G4S pursuant to the Contract. During a segment of the trip between Gilroy and Fresno, the shackled women were stuffed in a cramped rear compartment of a windowless van, and struggled to breathe in suffocating heat with no air circulation or water.

59.    G4S has received numerous complaints from detained individuals; for example, in the United Kingdom in 2010, G4S "received more than 700 complaints from detained immigrants, including allegations of assault and racism."[5] The number and circumstances of deaths linked to conduct by G4S employees have also

---

[5] *See* Lizzie Dearden, *G4S Suspends Nine Staff for Alleged Abuse of Migrants at Brook House Immigration Removal Centre*, The Independent, Sept. 1, 2017, available at https://www.independent.co.uk/news/business/news/g4s-migrants-absue-staff-suspended-immigration-removal-centre-private-security-company-a7923731.html; *see also* Stephen Matthews, *Scandal-hit security firm G4S receives 'unprecedented levels' of complaints after taking over a private ambulance service*, Daily Mail, Oct. 23, 2017, available at http://www.dailymail.co.uk/health/article-5008247/Security-firm-G4S-unprecedented-levels-complaints.html (noting that detention centers run by G4S received more than 700 complaints in 2010 and that nine staff members at an immigration detention center were suspended in 2017 after claims of abuse and assault).

come under scrutiny, including the death of an immigrant in the custody of G4S employees on an airplane.[6]

60.    In Australia, a coroner deemed the death of a detained immigrant that resulted from extreme temperatures in the back of a G4S van to be "wholly unnecessary and avoidable."[7]

61.    G4S's performance in non-immigration government contracts also shows that G4S has failed to adequately hire, train, and supervise its employees. G4S has held hundreds of millions of dollars' worth of private prison and security contracts with state and local governments, and a 2019 USA Today investigation revealed that investigators "substantiated more than 1,500 allegations against staff members at G4S-run juvenile detention centers between 2007 and 2017, including abuse, neglect and sexual violence."[8] And G4S has been a provider for "90 percent of U.S. nuclear facilities," where guards have repeatedly been found sleeping on the job.[9]

//

---

[6] Simon Hattenstone & Eric Allison, *G4S, The Company with No Convictions—But Does It Have Blood on Its Hands?*, The Guardian, Dec. 22, 2014, available at http://bit.ly/2cbvTFK.

[7] *See* Melissa Fyfe, *Uproar Over New Prison Contract*, The Sydney Morning Herald, Oct. 4, 2009, available at http://bit.ly/2u6nQ5I.

[8] *See* Brett Murphy & Nick Penzenstadler, *A security empire deployed guards with violent pasts across the U.S. Some went on to rape, assault or kill*, USA Today, Oct. 30, 2019, available at https://www.usatoday.com/in-depth/news/investigations/2019/10/30/dangerous-guards-low-cost-security-g-4-s/3994676002/.

[9] Eric Schlosser, *The Security Firm That Employed the Orlando Shooter Protects American Nuclear Facilities*, The New Yorker, June 27, 2016, available at https://www.newyorker.com/news/news-desk/the-security-firm-that-employed-the-orlando-shooter-protects-american-nuclear-facilities.

**IV.** **Hundreds of People Have Been Arrested Pursuant to the ICE Private Contractor Arrest Policy**

62.     Defendants finalized and have been systematically implementing the ICE Private Contractor Arrest policy since no later than 2016 across the San Francisco and Los Angeles Areas of Responsibility.

63.     G4S sign-in registers, G4S timesheets, monthly pickup logs, and motor vehicle control logs, show G4S employees engaging in dozens of arrests at a range of county jails and CDCR facilities throughout the San Francisco Area of Responsibility.

64.     ICE, through its own officers or through private contractors, arrested almost 1,600 people from CDCR facilities in federal Fiscal Year 2017 (October 1, 2016 to September 30, 2017); and arrested almost 1,100 people in FY 2018. Between January 1 and May 13, 2020, ICE, through its own officers or through private contractors, arrested approximately 575 people through transfers from CDCR to ICE custody. On information and belief, a majority of those people were arrested by G4S contractors without officers or employees of ICE present.

65.     ICE, through its own officers or through private contractors, arrested 7,971 people from county jails in California in FY 2017; and arrested 4,336 people in FY 2018. In calendar year 2019, ICE, through its own officers or through private contractors, arrested at least 1,685 people as they were transferred from county jail custody.

66.     In 2020, G4S contractors arrested people through transfers from CDCR at the following facilities throughout the Areas of Responsibility of the ICE San Francisco Field Office and the ICE Los Angeles Field Office: the Central California Women's Facility in Chowchilla; the California Correctional Institution in Tehachapi; San Quentin State Prison in San Quentin; Soledad State Prison in Soledad; Sierra Conservation Camp in Jamestown; California Men's Colony in San Luis Obispo; Shafter Modified Community Correctional Facility in Shafter; Mule

Creek State Prison in Ione; Avenal State Prison in Avenal; Wasco State Prison in Wasco; California City Correctional Facility in California City; and California Institute for Men in Chino.

67.    The similar experiences of numerous people who have been arrested by G4S at state prisons and county jails reflect the existence of a systematic, persistent, and longstanding Private Contractor Arrest Policy.

68.    Born in a Thai refugee camp after his family fled war in Laos, Somdeng Thongsy came to the United States as a toddler and grew up in Stockton, California. After serving over 20 years in prison for a crime he committed as youth, Mr. Thongsy was granted parole in recognition of his rehabilitation. Instead of being released from San Quentin to rejoin his family and community, a G4S contractor arrested Mr. Thongsy on December 20, 2016. ICE's Form I-213 states that the G4S employee placed Mr. Thongsy in full restraints, patted him down, and escorted him to a caged vehicle for transport. Mr. Thongsy was detained by ICE for several months before being released because ICE could not repatriate him. He was subsequently granted a full and unconditional pardon of his conviction by Governor Gavin Newsom.

69.    Ny Nourn was born in a refugee camp in Thailand after her mother fled genocide in Cambodia. She was sentenced to life in prison for failing to stop a murder committed by her abusive partner weeks after she turned 18. The state of California deemed her suitable for release, but on May 10, 2017, she was arrested by a G4S employee at the Central California Women's Facility ("CCWF"). Her CDCR Form 123 ("Body Receipt") states that she was released to "G4S Secure Solutions." On the day of her arrest, Ms. Nourn was escorted to a holding tank with three other women who were also prepared to be released on parole. A G4S employee arrived, ordered Ms. Nourn to place her hands against the wall and spread her legs, and placed chains around her waist, ankles, and wrists. Of the four women in the holding tank, Ms. Nourn was the only one arrested for immigration purposes. She was

placed in the back of an unmarked white van and driven for about four hours to the Yuba County Jail. Ms. Nourn was detained by ICE for six months, was granted protection from removal by an immigration judge, and was later granted a full and unconditional pardon of her conviction by Governor Newsom.

70.     Kao Nai Saeteurn, a refugee whose family fled bombings in Laos, was found suitable for parole in October 2019. He spent the last eight months of his time in CDCR custody at the Alder Conservation Camp #20, a fire camp in Klamath, where he helped fight eight wildfires. On February 3, 2020, he was driven from the fire camp to the Lassen Adult Detention Facility in Susanville. The next morning, a person wearing a grey uniform with a G4S logo arrested him and transported him to ICE custody. Mr. Saeteurn's arrest by G4S and detention by ICE caused him to miss his grandmother's funeral service.

71.     Rachana Duong is a refugee from Cambodia who has lived in the United States since he was a young child. After being found suitable for parole, Mr. Duong was transferred from California State Prison-Solano to ICE custody instead of being released. On March 17, 2020, private contractors arrived at the prison to arrest Mr. Duong. He spent months in ICE custody before being ordered released by a federal judge.

72.     Guled Hassan, a U.S. permanent resident who arrived in San Diego over 20 years ago as a Somali refugee, was arrested by G4S contractors at the California Men's Colony ("CMC") in San Luis Obispo on July 9, 2020. He had planned to reunite with his children and had arranged pickup by the San Diego probation department on July 11, 2020. CDCR officers woke Mr. Hassan on the morning of July 9, abruptly informing him that ICE would take custody of him that day. CDCR officers forced Mr. Hassan to leave his cell. He waited, cuffed and standing, for hours until a driver, believed to be a G4S employee, arrived in a van. When Mr. Hassan refused to be transferred, the driver called an ICE officer on his phone and was told that Mr. Hassan could not be left at CMC. CDCR officers held

Mr. Hassan and assisted the G4S driver in placing handcuffs on Mr. Hassan and chains on his legs and body. The G4S driver then drove Mr. Hassan to the ICE field office in Santa Maria, where he met an ICE officer for the first time. Mr. Hassan is now detained at Adelanto Detention Facility, which has had the largest COVID-19 outbreak of any ICE detention center in the country. As of October 2020, 147 people detained were infected. Mr. Hassan remains detained at Adelanto.

73.    On July 14, 2020, Jose Aguilar Carrion was released to G4S from Folsom State Prison in Folsom, California. His release date had been accelerated by CDCR from December 2020 to July 2020 to reduce the likelihood he would contract COVID-19 in a CDCR facility. Mr. Aguilar Carrion was taken to a release area inside the prison, and waited for approximately two hours while other men left the waiting area to meet their families or board vans to the bus station or airport. Finally two men in grey uniforms, believed to be G4S employees, arrived, placed handcuffs on his feet and hands, and drove him to the ICE office in Sacramento. The two men told Mr. Aguilar Carrion that they were not ICE officers. Mr. Aguilar Carrion later contracted COVID-19 in August 2020, while detained by ICE in Mesa Verde Detention Facility. If he had not been arrested by G4S, Mr. Aguilar Carrion had planned to live with his brother in Sacramento, and continue his education at Folsom Community College while working. Mr. Aguilar Carrion was detained until he was deported.

74.    John Victorio is a 41-year-old immigrant who has lived in the United States since he was fourteen years old. Mr. Victorio was informed that he was to be released from the Shafter Modified Community Correctional ("SMCC") facility in Shafter on July 25, 2020. On the morning of July 23, Mr. Victorio was awoken and told that he was being paroled. Mr. Victorio's two young sons, including one who is only a toddler, were waiting for his return. CDCR employees took Mr. Victorio to the receiving and release area of SMCC, where a G4S employee wearing a grey uniform was waiting for him. The person in the grey uniform took Mr. Victorio's

shoelaces and property and shackled his arms, waist, and legs. He was then placed in the back of a van and transported to the Mesa Verde immigration detention facility in Bakersfield. While he was held at the Mesa Verde facility, Mr. Victorio contracted COVID-19 due to the impossibility of social distancing. He was detained by ICE for about five months before being granted protection from removal by an immigration judge and released.

75.    Rene Octavio Gonzalez arrived in the United States at the age of two and attended elementary, middle, and high school in Compton, California. He was informed that he was to be released from Pleasant Valley State Prison in Coalinga in August 2020, and looked forward to working in his family's dry-cleaning business or with his father at a tuxedo rental company. His release was expedited due to the COVID-19 pandemic. On July 28, 2020, Mr. Gonzalez was transferred from CDCR to ICE custody. He was shackled, handcuffed, and placed in a van by person wearing a grey uniform bearing the words "private security" with a red and black logo on the shoulder. Mr. Gonzalez was ultimately deported and separated from his parents, siblings, and daughter in the United States.

76.    Patricia Waller, a domestic violence survivor, won her release from prison after fifteen years of incarceration. While in prison, Ms. Waller trained as a construction worker. She served as a mentor to other incarcerated people and created strong connections with community members that helped her find housing, transportation, and employment upon her release. In recognition of her significant contributions and commitment to meaningful change in her life, the California parole board found her suitable for release and granted her parole. Yet, on August 31, 2020, Ms. Waller was arrested by G4S employees at CCWF. She was transferred to an ICE detention facility, where she contracted COVID-19. She remained detained until she was ultimately deported.

77.    On September 23, 2020, Carlos Munoz was released to G4S from Correctional Training Facility-Soledad after being found suitable for parole by the

California Board of Parole Hearings. Mr. Munoz, who has asserted his innocence ever since his arrest and before the parole board, had earned the trust and respect of friends, counselors, and numerous CDCR officers in his years of incarceration. While in prison, Mr. Munoz created a crocheting program based on a restorative justice curriculum; the works created in the program were donated to veterans' homes. He also earned his high school diploma, an associate degree in business management, and a certification as a drug and alcohol counselor. The release plans approved by the parole board included a place in transitional housing and a job offer to work as a counselor. Yet, on September 23, 2020, two men in grey uniforms with patches, believed to G4S employees, arrived in the receiving and release area of CTF-Soledad to place Mr. Munoz in restraints around his feet and waistband. These men then drove him to the ICE office in Stockton. From there, Mr. Munoz was then taken to the Golden State Annex detention facility in McFarland, California, where he remains detained.

78.    Bounchan Keola, a refugee from Laos who came to the United States as a child, volunteered to serve as an incarcerated firefighter and battled six major wildfires during the 2020 wildfire season. In October 2020, he was on the frontlines of the Zogg Fire when a tree collapsed on him, nearly killing him and requiring him to be airlifted to a hospital. After being discharged, he was placed in solitary confinement at California State Prison-Sacramento due to an ongoing COVID outbreak in the general population there. On October 16, 2020, two weeks after being injured, G4S employees arrested him. He was transferred to the Golden State Annex detention facility where he was held for months.

79.    On December 14, 2020, a G4S employee arrested Ri Jbara at the California City Correctional Facility together with another individual leaving CDCR custody. The person who arrived to arrest Mr. Jbara wore a dark grey shirt with a tag on the shoulder, in contrast to the ICE officer who served Mr. Jbara with papers at the ICE Bakersfield office. Before Mr. Jbara was unlawfully arrested by G4S, he

had earned his GED and two degrees from Coastline Community College. He planned to start a nursing home or provide nursing care together with a friend and his wife. Mr. Jbara was eventually taken to the Golden State Annex detention facility, where he remains detained. His deportation is imminent.

80.     On January 15, 2021, Leo Burgos Zetina was transferred by CDCR to the custody of G4S employees at California State Prison-Solano. He waited in a holding tank in the release and reception area for about an hour and a half until a man wearing a uniform arrived. That man chained Mr. Burgos Zeta by shackling him from his waist to his hands and then down to his feet. He drove Mr. Burgos Zetina about 30 to 40 minutes to the ICE office in Sacramento, where he saw an ICE officer for the first time. From there, Mr. Burgos Zetina was taken to the Golden State Annex detention facility, where remains detained. His deportation is imminent.

81.     Jacobo Aranda Fernandez was arrested by G4S officers on January 15, 2021 in the California Correctional Center in Susanville, California. He was awoken in the early morning hours and informed by CDCR officers that he was being paroled three days before his scheduled release date. Mr. Aranda Fernandez waited in receiving and release for about 30 minutes. Eventually two people arrived; both were wearing grey uniforms. They cuffed Mr. Aranda Fernandez's hands and feet and drove over three hours to a gas station, where they transferred him to a different driver. That driver, also wearing a grey uniform, drove Mr. Aranda Fernandez erratically, swerving across lanes. Over an hour later, Mr. Aranda Fernandez arrived at the ICE office in Sacramento, where he met an ICE officer for the first time. From there, Mr. Aranda Fernandez was driven by G4S employees to the Golden State Annex detention facility, switching vans several times for a journey that lasted the entire day. Prior to his release from CDCR, Mr. Aranda Fernandez had worked for three fire seasons as a firefighter. For 50 days, he fought the August Complex fire in 2020, the largest recorded wildfire in California history. Cal Fire offered to hire Mr.

Aranda Fernandez after his release, a job that could provide a good future for his wife, children, and mother. Mr. Aranda Fernandez remains detained.

82.    By retaining and directing G4S to engage in unlawful arrests, Defendants have wrongfully deprived hundreds of people of their liberty, including subjecting them to hours-long drives by G4S employees, before encountering an ICE officer at an ICE office.

**V.    <u>Plaintiff Gabriela Solano Faces Imminent Transfer to and Arrest Pursuant to ICE's Private Contractor Policy</u>**

83.    Gabriela Solano is a 48-year-old woman who has lived in the United States since she was two years old. Ms. Solano became a lawful permanent resident when she was about eight years old.

84.    As a child, Ms. Solano lived with her family in the Los Angeles area, including in El Monte and Montebello. Ms. Solano attended Mountain View High School in El Monte.

85.    Ms. Solano excelled in school, making honor roll as a freshman in high school and joining the cheerleading team. Her troubled relationship with her mother left Ms. Solano feeling frustrated and worthless. In a difficult period of her life, and at a school for juveniles on probation, Ms. Solano met another teenager who would become her partner.

86.    Beginning in her late teens, Ms. Solano's partner physically and verbally abused Ms. Solano. He would kick her, spit on her, and call her "nobody" and "nothing." Ms. Solano suffered bruises, black eyes, and split lips. Though her partner was arrested for his abuse, the violence continued. In 1997, Ms. Solano gathered the courage to leave her partner.

87.    Ms. Solano was living in Montebello, California in September 1998. That month, a week after her 26th birthday, Ms. Solano received a call from her ex-partner. He asked Ms. Solano for a ride in exchange for money and drugs. Ms.

Solano, who was self-medicating with drugs to cope with the trauma of her abuse and saw her ex-partner's need as a way for her to gain control, agreed.

88.     That night, the passengers that Ms. Solano drove, including her ex-partner, shot and killed a pedestrian in a botched robbery. Ms. Solano, shocked and horrified, was arrested a few days later. Ms. Solano accepts full responsibility for her role in this crime.

89.     Ms. Solano was convicted of murder under the felony murder rule, which has since been narrowed through state legislation, and sentenced to life without the possibility of parole. Ms. Solano's conduct would likely not constitute felony murder pursuant to the current version of the rule; she is pursuing a petition to vacate her conviction. *See* Cal. Penal Code § 189(e); S.B. No. 1437, 2018 Legis. Serv. Ch. 1015, § 3 (Cal. 2018).

90.     Ms. Solano has spent the last 20 years seeking positive change for herself and for others, and working to heal from the longstanding effects of her own trauma. She took over 1,000 hours of rehabilitative classes, volunteered to support fellow incarcerated survivors through the Walk of Love project, resides in an honor dorm at CCWF, and was elected to the Inmate Advisory Council. She has focused on addiction recovery intensely, celebrating over 20 years of sobriety and earning praise for her participation in 12-step programming. And in the face of COVID-19 lockdowns limiting programming, Ms. Solano committed to intensive self-study.

91.     Ms. Solano used her vocational training in office services to serve as a clerk for over 12 years. In a recent evaluation, her supervisors noted that she was an excellent employee who was proactive, organized, and respectful. As a clerk in the prison adult school, she applied her teaching ability to tutor students and train new clerks.

92.     Ms. Solano has earned numerous commendations from prison staff members. They have praised Ms. Solano's positive attitude and respect for herself

Case No.

and others; her willingness to do what is needed of her; and her initiative and leadership in facilitating numerous self-help groups.

93.     Ms. Solano has earned two degrees while in prison: an Associate of Arts degree in Social and Behavioral Science and an Associate of Arts degree in Liberal Arts.

94.     In recognition of her commitment to service, mentorship, and rehabilitation, in 2018 Governor Jerry Brown commuted her sentence to 20 years to life, making her eligible for parole. He noted that Ms. Solano's record in prison was a testament to her transformation and focus on rehabilitation: earning her GED in prison and working towards her associate degree; completing vocational training to become an office clerk; and participating in various self-help programs around substance abuse, relationships, and self-esteem. She also donated to charitable causes and participated in volunteer events.

95.     After 22 years of incarceration, on December 30, 2020, Ms. Solano was found suitable for release at a hearing by members of the California parole board. The parole board found her suitable based not only on the clear showing of her rehabilitation but also her detailed reentry plans. Critically, the parole board determined that Ms. Solano does not pose an unreasonable risk of danger to society or threat to public safety.

96.     Ms. Solano anticipates being released from CDCR custody after an administrative review period and potential review by the Governor is completed. The review process may be accelerated due to the presence of COVID-19 in CDCR facilities. CDCR staff have informed Ms. Solano that March 15, 2021 is her tentative release date.

97.     Upon her release, Ms. Solano intends to join a transitional program in San Bernardino. The program offers a supportive living environment for women following their release from prison, including 12-step meetings and assistance

finding employment, medical care and mental health treatment, and transportation. She has also been offered a placement in a transitional program in Los Angeles.

98.    Ms. Solano has a passion for language and hopes for a career in civic translation and English as a Second Language instruction. She looks forward to rejoining her mother and younger sister, since she has applied the insights learned in her self-help programs to repair those relationships.

## **CLASS ALLEGATIONS**

99.    Ms. Solano seeks to represent a class under Federal Rule of Civil Procedure 23(b)(2) consisting of:

All individuals who are currently, or will be in the future, in custody at CDCR facilities or county jails within the Areas of Responsibility of the ICE San Francisco Field Office and Los Angeles Field Office, who are the subject of an ICE detainer request.

100.    This case is ideally suited to class treatment. All individuals in prisons and county jails with an ICE hold face the likelihood that they will be arrested pursuant to ICE's Private Contactor Arrest Policy and in violation of the INA and its implementing regulations.

101.    The proposed class satisfies the requirements of Rule 23(a)(1) because it is sufficiently numerous so as to make joinder impracticable. There are at least hundreds of current and future members of the class. Joinder is also impracticable because many in the proposed class would have to proceed *pro se*, are indigent, have limited English proficiency, and/or have a limited understanding of the U.S. legal system.

102.    The proposed class meets the commonality requirements of Federal Rule of Civil Procedure 23(a)(2) because there are common questions of law and fact affecting members of the proposed class. The common core of facts involves Defendants' practice of systematically using G4S employees to arrest individuals at CDCR facilities and county jails without an ICE immigration officer present. The

common legal questions include but are not limited to: whether ICE violates the Immigration and Nationality Act by retaining and directing G4S to arrest individuals in jails and prisons without an ICE immigration officer present; whether ICE violates the INA's implementing regulations by retaining and directing G4S to arrest individuals in jails and prisons without an ICE immigration officer present.

103.    The proposed class meets the typicality requirement of Federal Rule of Civil Procedure 23(a)(3) because the claims of the representative Plaintiff are typical of the claims of the class as a whole. Ms. Solano is the subject of an ICE detainer request. She faces arrest by G4S employees at the CDCR facility where she is currently detained, pursuant to the ICE Private Contractor Arrest Policy. She will be harmed by the same course of conduct as the rest of the class, namely Defendants' policy of routinely and systemically directing and retaining G4S employees to arrest individuals at jails and prisons in California for immigration enforcement purposes without any ICE immigration officer present, in violation of the INA and implementing regulations. Ms. Solano seeks similar relief as the rest of the class.

104.    The proposed class meets the adequacy requirements of Federal Rule of Civil Procedure 23(a)(4). Ms. Solano has committed to fairly and adequately protecting the interests of the class and is aware of no conflict that would preclude fair and adequate representation.

105.    Proposed class counsel are highly qualified to serve as class counsel and collectively have extensive experience litigating class actions, immigration detention cases, and cases challenging state and local transfers of custody to ICE and other immigration enforcement practices.

106.    Finally, the proposed class satisfies Federal Rule of Civil Procedure 23(b)(2) because Defendants' conduct threatens all class members. An injunction and declaration will provide relief on a class-wide basis.

107.   In the alternative, the requirements of Rule 23(b)(1) are satisfied because litigating separate actions would create a risk of inconsistent or varying adjudications with respect to individual class members that would establish incompatible standards of conduct for the party opposing the proposed class.

## CLAIMS FOR RELIEF

### COUNT ONE

### Administrative Procedure Act, 5 U.S.C. § 706(2)(A), (C):

### ICE's Private Contractor Arrest Policy Violates the Immigration And Nationality Act

108.   The INA requires arrests of individuals for violations of immigration law, with or without an administrative arrest warrant, to be conducted by "officer[s] or employee[s] of the Service" under regulations to be issued by the Attorney General. *See* 8 U.S.C. § 1357(a). The INA further defines "immigration officer" as "any employee or class of employees of the Service or of the United States designated by the Attorney General, individually or by regulation, to perform the functions of an immigration officer specified by this chapter or by any section of this title." 8 U.S.C. § 1101(a)(18).

109.   The Administrative Procedure Act, 5 U.S.C. § 706, provides that a Court "shall hold unlawful and set aside agency action, findings, and conclusions found to be – (A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; (B) contrary to constitutional right, power, privilege, or immunity; [or] (C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right."

110.   Pursuant to the Private Contractor Arrest Policy, Defendants have routinely and systemically directed and retained G4S employees to arrest individuals at jails and prisons in California for immigration enforcement purposes without any ICE immigration officer present. G4S and its employees are third-party independent contractors who are not officers or employees of ICE. Defendants implement the

Private Contractor Arrest Policy with full knowledge that G4S employees do not constitute "immigration officers" within the meaning of the INA.

111.   ICE's Private Contractor Arrest Policy is final agency action that is contrary to the law, including, but not necessarily limited to, 8 U.S.C. § 1357(a), and in excess of the statutory authority conferred by 8 U.S.C. § 1357(a).

112.   To the extent that Defendants have interpreted the INA, including 8 U.S.C. § 1357(a), to authorize its Private Contractor Arrest Policy and to authorize G4S employees to perform immigration arrests of individuals at jails and prisons, that interpretation is final agency action that is arbitrary and capricious.

113.   Ms. Solano has exhausted all available administrative remedies and has no adequate remedy at law.

114.   For the reasons stated herein and pursuant to 28 U.S.C. §§ 2201-02, ICE's Private Contractor Arrest Policy should be declared unlawful.

115.   ICE's Private Contractor Arrest Policy should therefore be set aside pursuant to 5 U.S.C. § 702 and 5 U.S.C. § 706(2), and ICE should be prohibited from continuing to use third-party contractors, like G4S, and those contractors' employees to perform immigration arrests on ICE's behalf.

**COUNT TWO**

***Accardi* Doctrine:**

**ICE's Private Contractor Arrest Policy Violates Federal Regulations**

116.   Federal regulations implementing the INA set forth who can perform arrests for violations of immigration law. Only "immigration officers who have successfully completed basic immigration law enforcement training are [] authorized and designated to exercise [warrantless] arrest power." 8 C.F.R. § 287.5(c)(1); *see also* 8 C.F.R. §§ 287.8(b)(3), (c)(1). Likewise, only those "immigration officers" are authorized to execute arrest warrants for administrative immigration violations. 8 C.F.R. § 287.5(e)(3); 8 C.F.R. § 287.8(c)(1); 8 C.F.R. § 1236.1(b)(1).

117.    ICE's Private Contractor Arrest Policy is contrary to applicable federal regulations.

118.    Pursuant to the Private Contractor Arrest Policy, ICE directs and permits G4S and its employees to arrest people at jails and prisons even though G4S employees neither constitute "immigration officers" under applicable federal regulations nor have undertaken "basic immigration law enforcement training" as required by those regulations.

119.    For the reasons stated herein and pursuant to 28 U.S.C. §§ 2201-02, ICE's Private Contractor Arrest Policy should be declared unlawful and set aside under the principle articulated in *United States ex. rel. Accardi v. Shaughnessy*, 347 U.S. 260 (1954), and ICE should be prohibited from continuing to use third-party contractors, like G4S, and those contractors' employees to perform immigration arrests on ICE's behalf.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully asks that this Court:

a.      Certify the proposed Class as indicated above, and appoint the named Plaintiff as class representative and the undersigned counsel as class counsel;

b.      Declare that Defendants' Private Contractor Arrest Policy violates the Immigration and Nationality Act;

c.      Declare that Defendants' Private Contractor Arrest Policy violates the INA's implementing regulations;

d.      Set aside and enjoin Defendants' Private Contractor Arrest Policy pursuant to the Administrative Procedure Act and order compliance by Defendants with their statutory and regulatory obligations;

e.      Award attorney's fees under the Equal Access to Justice Act, 28 U.S.C. § 2412(d), and on any other basis justified under law;

f.      Retain jurisdiction after entry of judgment to monitor compliance by Defendants with the provisions of the judgment; and,

1    g.    Grant such other and further relief in favor of Plaintiff as this Court

2    deems just and appropriate.

3

4    DATED:  February 19, 2021          MUNGER, TOLLES & OLSON LLP

5

6

7                                       By: */s/ David W. Moreshead*
                                        DAVID W. MORESHEAD
8                                       Attorneys for Plaintiff

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Case No.
CLASS ACTION COMPLAINT